IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Gregory and Debra Pierce, *et al.*, | : | |
| | : | Case No. 1:05-CV-219 |
| Plaintiffs-Appellants, | : | |
| v. | : | District Judge Susan J. Dlott |
| | : | |
| Mason City School District, Board of | : | ORDER AFFIRMING FINAL |
| Education, | : | DECISION AND ENTRY OF STATE |
| | : | LEVEL REVIEW OFFICER |
| Defendant-Appellee. | : | |

This matter comes before the Court on the Post-Hearing Brief Filed on Behalf of Amelia

Pierce (doc. 18) by the Plaintiffs-Appellants Gregory and Debra Pierce and the Post-Hearing

Brief on Appeal of Mason City School District Board of Education (doc. 19.) Gregory and

Debra Pierce are the parents of Amelia Pierce, a child with a disability as defined in the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, *et seq.* Amelia Pierce

attended school in the Defendant-Appellee Mason City School District ("Mason") at the

beginning of the 2003-2004 school year. Pursuant to the IDEA, Mason had proposed an

individualized education plan ("IEP") for the purpose of educating Amelia. The Pierces did not

approve the IEP and withdrew Amelia from Mason in December 2003. Subsequently, they

enrolled Amelia in a private school and sought tuition reimbursement from Mason.

In the state administrative proceedings that followed, a state level review officer

("SLRO") determined in the state administrative proceedings that the IEP Mason had proposed

for Amelia was designed to offer her a free appropriate public education and that the Pierces

were not entitled under the IDEA for tuition reimbursement. The Pierces filed the instant action

to overturn the decision of the SLRO as to both issues. The Court held an evidentiary hearing on

1

September 25 and 26, 2006 and both parties filed post-hearing briefs. For the reasons that follow, the Court **AFFIRMS** the decision of the SLRO.

I.     **IDEA OVERVIEW**

The IDEA provides federal funds to helps states educate disabled students. 20 U.S.C. § 1411. To qualify for federal funding, the IDEA requires states to provide "A free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A). The IDEA also requires that a school district provide an individualized education program ("IEP") for each eligible child with a disability. 20 U.S.C. § 1414(d)(1)(A). Finally, the IDEA requires that the IEP for each child educate the child in the "least restrictive environment" possible. 20 U.S.C. § 1412(a)(5). This mainstreaming requirement means that children with disabilities are to be educated separately from children without disabilities "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Id.

The duty to provide a student with a "free appropriate public education" is often referred to as the duty to provide the student with a "FAPE." Schools satisfy this requirement by:

> providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

Board of Educ. v. Rowley, 458 U.S. 176, 203-04 (1982).

"An IEP provides a free appropriate public education if (1) the state has complied with the procedures set forth in the IDEA and (2) the IEP developed through the procedures is reasonably calculated to enable the child to receive educational benefits." Dong v. Board of Educ. of Rochester Cmty. Schs., 197 F.3d 793, 800 (6th Cir. 1999). "If the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." Id. Courts must "strictly review" an IEP for procedural violations, but "technical deviations do not render an IEP invalid." Kings Loc. Sch. Dist., Bd. of Educ. v. Zelazny, 325 F.3d 724, 731 (6th Cir. 2003) (citation omitted). The Sixth Circuit instructed that "[o]nly if we find that a procedural violation has resulted in such substantive harm, and thus constituted a denial of [the child's] right to a FAPE, may we grant such relief as the court deems appropriate." Id. at 732 (citation omitted).

The IDEA requires an IEP to confer a "meaningful educational benefit" upon the disabled child "gauged in relation to the potential of the child at issue." Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004). The Court must evaluate the IEP based on the terms of written IEP document and what the school district promised to provide in the written document, not what the school district might have provided or had the capacity to provide. Knable v. Bexley Sch. Dist., 238 F.3d 755, 768 (6th Cir. 2001). The proper test is whether the IEP was "reasonably calculated" to provide educational benefit, a standard that would seem to preclude an examination of the results of the IEP in hindsight. See Rowley, 458 U.S. at 201 ("We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of specialized instruction and related services which are individually designed to provide educational benefit."). Nonetheless, the Sixth Circuit has stated that "[a]cademic results have

3

been recognized as an important factor in determining whether an IEP is reasonably calculated to

provide educational benefits."  Berger v. Medina City School Dist., 348 F.3d 513, 522 (6th Cir.

2003).  Even the Supreme Court in Rowley recognized that progress may be relevant to the

"reasonably calculated" inquiry.  458 U.S. at 207 at n. 28.  "When the handicapped child is being

educated in the regular classrooms of a public school system, the achievement of passing marks

and advancement from grade to grade will be one important factor in determining educational

benefit."  Id.

## II.    FINDINGS OF FACT

1.      Amelia Pierce resides with her parents in the Mason City School District.

2.      Amelia has a disability as defined in the IDEA.  Amelia has been diagnosed with central
        auditory processing deficits, fine visual-motor and visual-perception delays, attentional
        deficit hyperactivity disorder ("ADHD"), petit mal seizures, and dsylexia.  (Mason Ex.
        Bk. 228-242; DP Tr. 24-26, 1068.)

3.      Amelia attended kindergarten for one year in general education, and then repeated
        kindergarten in a special education classroom.  After Amelia's kindergarten years, the
        Pierces moved to the Chicago-area of Illinois.  Amelia received her first and second
        grade educational services in self-contained special education classrooms in the Gurnee
        School District in Illinois.  (DP Tr. at 475-79.)

4.      Amelia attended third grade in the Antioch Community Consolidated School District
        ("Antioch") in Illinois after her family moved again.  Her third grade placement at
        Antioch was in a special education classroom, except for social studies and science for
        which she was mainstreamed.  (DP Tr. at 479.)

5.      Amelia regressed in her achievement in social studies during the third grade year.
        Amelia's teacher was unsure whether the work was becoming too difficult for Amelia or
        whether Amelia had become frustrated and had given up.  Amelia was earning a "B"
        grade in social studies at the time that her regression was noted.  (Mason DP Ex. 1 at
        011.)

6.      Antioch proposed an IEP for Amelia for fourth grade which removed her from
        mainstreamed social studies and science and increased her special education services and
        therapies from 1190 total minutes per week to 1400 total minutes per week.  She was to
        be mainstreamed only for music, PE, lunch and science lab.  The Pierces' desire to have

Amelia receive more instruction in reading and language arts was the driving force behind the decision to end Amelia's participation in regular social studies.  (Pierce–026; DP Tr. at 73-74, 486, 1198-2000.)

7.      The Antioch classroom where Amelia attended class in third grade, and where she would have attended fourth grade, was a self-contained instructional classroom.  The term "instructional classroom" in Illinois was used when the students therein received more than 50% of their education each day in special education.  Students in the instructional classroom had difficulty with focus or concentration in the regular classroom, could become frustrated in the regular classroom, and had difficulty following the pace of the regular classroom.  Some students in the instructional classroom were mainstreamed for certain subjects and would come in and out of the instruction classroom throughout the day.  Instructional aides from the instructional classroom, who were not teachers, sometimes assisted the students during their time in the regular classroom.  (DP Tr. at 487, 1172-1179, 1189, 1195.)

8.      Mr. Pierce expressed his own understanding of what Antioch's self-contained classroom involved.  He believed that all students therein had similar disabilities and all stayed in the classroom for all of their core academic subjects.  Other students would not use the classroom for limited periods of extra instruction.  (DP Tr. at 843.)

9.      Amelia would have been taught reading, language arts, mathematics, and social studies during fourth grade in the self-contained instructional classroom at Antioch.  The social studies curriculum was to be used to support Amelia's reading and language arts development.   (DP Tr. at 487, 1172-79, 1189, 1195.)

10.     At the insistence of the Pierces, Antioch agreed to educate Amelia in the fourth grade using one of the "brand name" multisensory approach teaching methods such as Wilson, Orton-Gillingham, or Linda Mood Bell.  Antioch had been using non-brand name multi-sensory approaches and techniques prior to that time.  (DP Tr. at 1185-86.)

11.     After Antioch had drafted a fourth-grade IEP for Amelia, but before the academic year began, Amelia and her parents moved to Mason, Ohio during the summer of 2003 year and Amelia enrolled in the Mason City School District for the 2003-2004 school year.  (Doc. 19 at 1.)

12.     Jeanne Ferre, Ph.D., an expert for the parents at the state due process hearing, evaluated Amelia in June 2003.  She testified at the due process hearing that students with auditory processing difficulties benefit from having oral instructions broken down into small subsets, having instructions repeated or provided a second time in writing, or reinforced by a teacher aide working with the student.  (DP Tr. at 535-36.)

13.     Dr. Ferre recommended the use of a multi-sensory teaching method such as Orton-Gillingham to improve Amelia's academic skills.  (DP Tr. at 525.)

5

14.    Dr. Ferre also recommended the use of preferential classroom seating, reduction in extraneous noise, providing Amelia with additional materials in writing, and the use of manipulatives.  (DP Tr. at 539.)

15.    Other experts who had evaluated Amelia in June 2003, including a clinical neuropsychologist, a pediatrician, and two pediatric neurologists, also recommended the that Amelia be educated in a small, structured classroom with few students and with the use of multi-sensory teaching methods.  (Pierce–123, 210, 224, 259.)

16.    Amelia entered Mason in the fourth grade, consistent with her chronological age, but her academic skills were in the range of a first grader.  (Pierce–215, 282; DP Tr. at 73, 128.)

17.    Mason agrees that Amelia learns best using multi-sensory teaching methods and in a small-group or one-on-one setting.  Mason also concedes that Amelia requires occupational therapy to address her fine visual-motor and visual-perception delays, and speech therapy to improve her language skills.  (Doc. 19 at 21.)

18.    On August 28, 2003, Mason held an IEP meeting with the Pierces, days before the school year began.  The Pierces expressed at the meeting that they did not want Amelia to participate in general education at all.  Mason explained that it had hired an instructional aide for the purpose of assisting Amelia in a general education classroom setting.  An IEP was not developed at this August 28th meeting.  (DP Tr. at 20-21, 125, 170-71.)

19.    The next meeting between Mason and the Pierces was scheduled for September 11, 2003, but could not be held until September 18, 2003 because Gregory Pierce had a scheduling conflict.  (DP Tr. at 22.)

20.    At the September, 18, 2003 meeting, Mason identified two primary concerns about the IEP Antioch had proposed for Amelia's fourth grade year.  First, they were concerned that Amelia was not receiving her education in the least restrictive environment possible for her, and second, they were concerned that Antioch did not sufficiently state measurable goals.  Regarding the first area of concern, Mason did not want to assume that because Amelia had not made progress in the mainstreamed classroom that more pull-out was needed.  Instead, Mason favored changing the instructional method used to teach Amelia in the general education classroom, such as providing for an instructional aide for her.  Regarding the second concern, Mason preferred the curriculum-based baseline measurement system that it used to the system used by Antioch.

21.    Also at the September 18th meeting, the Pierces stated their concerns that Amelia could not learn adequately in a general education classroom because of her auditory processing difficulties and poor reading ability.  The Pierces were also concerned that Amelia would become frustrated and shut down in a regular classroom.  (DP Tr. at 31-32.)

22.    Mason did not propose a formal IEP at the September 18th meeting.  However, it did

6

provide the Pierces with a proposed school schedule for Amelia for the first day of school until the IEP could be developed.  Mason prepared a short one-page written schedule for Amelia:

> Bus to regular classroom for homeroom.
> Resource Room for reading - 45 min.- group of 3
> Back to classroom for specials 9:05-9:45
> Resource Room until 10:15 - Math 1:1 or w/ 1 other student
> Back to math in regular classroom - pulled for O.T. 10:20 - 10:45
> 10:45 Back to class for science to 11:40
> 11:45 Lunch to 12:25
> 12:40 - 1:25    T-Th Writing group resource room
>       1:00     M-W-F Language arts - regular class
> Move into Soc. St. until 2:45 ish

Amelia was mainstreamed for art, music, PE, lunch and recess.  (DP Tr. at 26, 29-31, 76-80, 131-38; Mason DP Ex. 12 at 063.)

23.    Amelia's special education teacher at Mason, Sherrie Freudiger, was trained in the Orton-Gillingham method of multisensory instruction for reading.  (DP Tr. at 142.)  She testified that she used the Orton-Gillingham method for teaching Amelia both reading and math, and used a multisensory approach throughout the day.  (DP Tr. at 147-48, 225, 364.)

24.    Ms. Freudiger testified that Amelia was taught in the resource room during the M-W-F language arts regular class depending on the activity to be done that day.  She also testified that Amelia spent " a lot of [ ] time" of her regular classroom time receiving small group or one-on-one instruction.  (DP Tr. at 31, 131-38; Mason DP Ex. 12 at 063.)

25.    The instructional aide hired by Mason when it learned that Amelia would be attending Mason City Schools assisted other students as well as Amelia in Amelia's general education classroom.  (DP Tr. at 89, 172.)

26.    There were generally a maximum of five to six students in the resource classroom at Mason at any one time.  Students were taken in and out of the resource room all day long. Students received both small group and one-on-one instruction in the resource room. (DP Tr. at 31, 131-38; Mason DP Ex. 12 at 063.)

27.    Ms. Freudiger testified that she or the instructional aide repeated classroom instructions for Amelia and asked her to repeat the instructions to ensure that she understood them. (DP Tr. at 214.)

28.    Ms. Freudiger also testified that they gave Amelia a noise scale to use to tell them when the classroom was becoming too noisy for her.  (DP Tr. at 213.)

29.    The next meeting between Mason and the Pierces was scheduled for October 2, 2003, but did not occur until October 21, 2003. Prior to the October 21st meeting, Mr. Pierce talked to Ms. Freudiger and told her that Amelia had vomited at home one evening. The school attributed the vomiting to a virus that was making many school children sick. (DP Tr. at 34.)

30.    On October 14, 2003, Mr. Pierce sent a letter to Mason. In it, he expressed the following concerns: Amelia has been showing signs of frustration and anxiety (e.g. excessive headaches, vomiting, excessive tiredness), lack of desire to go to school, and had exhibited excessive anxiety over homework. Mr. Pierce also stated that Amelia had complained that the the classroom environment is too loud for her to focus and concentrate. (Mason DP Ex. 31; DP Tr. at 34, 84; Pierce–072.)

31.    Mason teachers and educators did not see Amelia exhibit similar signs of frustration or anxiety at school. Rather, they described a girl who skipped down the hallway, participated in classroom activities, socially interacted with her peers, and appeared happy. (DP Tr. at 35, 153-56, 225.)

32.    Ms. Freudiger did admit that in response to her questions to Amelia about how Amelia was feeling that Amelia sometimes stated that she thought school was "too hard," but she did not indicate that she was frustrated. (DP Tr. at 155.)

33.    On October 21, 2003, a formal IEP meeting was held. The Pierces reiterated their concerns stated in the October 14, 2003 letter. They also brought the results of a private evaluation of Amelia completed by Dr. Mark Evans.

34.    Mason presented the Pierces with their formal IEP at the October 21, 2003 meeting, but may have provided the Pierces with a draft of it in the days prior to the meeting. The IEP provided for a full-time instructional aid to support targeted classroom activities, individual and small group instruction, materials and directions read aloud, oral responses accepted, lower level material, extended time, graphic organizers, visual cues/models, preview questions during reading, highlighting of key words, preprinted class notes, use of a calculator, Touch Math, manipulatives, use of a number line and multi-sensory reading program. (Pierce–072; DP Tr. at 37-39, 84; Mason DP Ex. at 080-97.)

35.    The IEP addressed in depth Amelia's then present levels of performance in the core academic subjects along with speech therapy, auditory comprehension, and topic maintenance. It then stated seven goals in different content areas (English, reading comprehension, written expression, math, writing conventions, and language arts), and stated multiple specific benchmarks or short-term objectives for each. Finally, it specifically identified the support services Mason would utilize to help Amelia reach the goals and in what setting she would receive those services. (Mason DP Ex. at 080-97.)

8

36. Mason had conducted assessments to come up with baseline measurements in devising the formal IEP proposal. The assessments included both curriculum-based testing and standardized testing. (D.Ct. Tr. at 184.)

37. Mason utilized a five-teacher team to teach Amelia pursuant to the proposed IEP. Ms. Freudiger was the only special education teacher; the others were general education teachers. The team met weekly to monitor Amelia's progress and evaluate her needs. (D.Ct. Tr. at 177.)

38. Mason explained to the Pierces at the October 21st meeting its preference for curriculum-based measures versus the use of individual achievement tests. The Pierces preferred the use of standardized testing to measure results and presented Mason with a list of proposed goals for Amelia based on targeted one-level increases on the Weschler Individual Achievement Test-II ("WIAT-II"). (Pierce–072; DP Tr. at 37-39, 84; Mason DP Ex. at 080-97.)

39. Mason and the Pierces discussed at the meeting changing the 60 minutes of speech therapy proposed in the IEP to 90 minutes per week per and Mason agreed to drop any requirement of homework for Amelia. (DP Tr. at 40; Mason DP Ex. 13 at 083.)

40. The Pierces also objected to Amelia's placement. They wanted Amelia taught in a self-contained classroom with the same group of students all day using a brand-name multi-sensory teaching method. They did not favor the use of Mason's resource classroom because other students would come-and-go throughout the day. (DP Tr. at 873.)

41. The Pierces at the October 21st meeting turned down Mason's offer to have Amelia talk to the school psychologist or the guidance counselor to address the Pierces' concern that Amelia was frustrated, tired, and did not want to come to school. (DP Tr. at 41-42.)

42. The Pierces refused to sign the IEP at the October 21st meeting. Mr. Pierce stated that he would present his concerns about the IEP in writing to Mason after the meeting. He never presented any written statement of the Pierce's disagreement after the October 21st meeting. (DP Tr. at 43.)

43. On November 6, 2003, Mr. Pierce called Mason to discuss what he believed to be Amelia's increasing signs of anxiety. He related that Amelia was increasingly more frustrated, that she felt overwhelmed, that she said that she wanted to go to heaven instead of going to school, and that she saw no hope in going to school. (DP Tr. at 44; Mason DP Ex.. 31 at 187.)

44. Mason's response during the call and in a follow-up letter was to again request that Amelia be permitted to speak to the school psychologist for support and encouragement (not for diagnoses or formal evaluations), to again alleviate homework concerns, and to request Mr. Pierce's written objections to the proposed IEP. The Pierces did not

authorize Amelia to see the school psychologist.  (DP Tr. at 45.)

45.    Again, Mason's special education director and educators did not see her exhibit these
       signs of anxiety at school.  They talked to her bus driver and cafeteria workers, and those
       workers also did not witness any signs of anxiety in Amelia.  (DP Tr. at  47.)

46.    Ms. Freudiger wrote an internal note to her file dated November 12, 2003 that Amelia
       told her that her Mom took her out of school for a doctor's appointment early one day
       when her appointment was not until the following day.  When asked about the note, Ms.
       Freudiger commented that Amelia was missing school regularly and that her appearance
       was starting to deteriorate.  (Pierce–191; DP Tr. at 204.)

47.    Mark Evans, Psy.D, Clinical Neuropsychologist, completed a psychological evaluation of
       Amelia on November 11 and 13, 2003 at the Pierces' request.  He reported that her test
       results were "consistent with an acute anxiety with emergent depressive symptoms" and
       that the "focal stressor ... appears to be her current school placement," but he also noted
       the stressors of her recent move to Cincinnati and loss of contact with her best friend.  He
       recommended a "reprieve . . .  from her current school placement."  (Pierce–287.)

48.    The Pierces wrote another letter to Mason dated November 13, 2003 expressing their
       increasing concern for Amelia's emotional well-being.  They described Amelia crying
       about school, experiencing stomach aches, headaches, and difficulty sleeping, stating that
       she was dumb, and feeling embarrassed because she did not understand her schoolwork,
       complaining that the classrooms are too loud, digging her fingernails into her skin, and
       stating that even God cannot help her.  (Mason DP Ex. 31 at 189.)

49.    The Pierces also indicated in the November 13th letter that they had not agreed to
       counseling at the school because they had decided to have Amelia's emotional state
       formally evaluated by a professional and that they would not sign the IEP on the advice
       of their attorney.  (Mason DP Ex. 31 at 189.)

50.    Dr. Evans formally observed Amelia in a classroom at Mason for approximately one hour
       in the afternoon of December 11, 2003.  In his report, Dr. Evans described Amelia as
       "generally attentive, though intermittently engaged" and as "never observably distressed
       or frustrated."  He stated that she "raised her hand for questions" and interacted with her
       peers in an appropriate and positive manner.  He also noted that Amelia asked a
       significantly greater number of questions than her peers which seemed to signal her
       difficulty in understanding the auditory instructions given during the class.  (Mason DP
       Ex. 10 at 044.)

51.    December 11, 2003 was the last day of classes Amelia attended at Mason.

52.    Dr.  Evans testified that he received an escalating number of phone calls from the Pierces
       in November and December 2003 regarding Amelia's increasing anxiety.  (D.Ct. Tr. at

40-41.)

53.     On December 15, 2003, Dr. Evans received a phone call from Debra Pierce in which she
        reported comments from Amelia that Dr. Evans concluded were "suicidal ideation
        statements." (D.Ct. Tr. at 46.)

54.     On December 16, 2003, Dr. Evans recommended that Amelia be removed from school at
        Mason at least temporarily. He recommended an alternative school placement for
        Amelia stating that she would have "the highest potential for success [in] a self-contained
        classroom supporting the patient's central auditory processing deficits and other learning
        disabilities." Dr. Evans stated at the due process hearing that he intended that this
        recommendation could be met within the Mason school environment. (Pierce–293-94;
        DP Tr. at 753-54; D.Ct. Tr. at 48-49.)

55.     Dr. Evans described a self-contained classroom as one being composed of a group of
        seriously-impaired students who are taught the same academic subjects together each
        day. Dr. Evans' definition of a self-contained classroom does not require that the
        students take each academic subject together. Thus, the group of students who take
        mathematics may not be the same group of students who take language arts. But the
        same group of students takes mathematics together every day. (Pierce–293, 294; DP Tr.
        at 649-50, 677-79; D.Ct. Tr. at 25-26, 31-32.)

56.     Dr. Evans generally recommended against educating Amelia in a resource classroom
        which he distinguished as having more mildly impaired students than the seriously
        impaired students in a self-contained classroom. However, he admitted that there could
        be very little difference in how Amelia could be taught in Mason's resource classroom
        versus the self-contained classroom he favored in terms of the student-teacher ratio, the
        structure of the classroom, and the type of instruction given. (DP Tr. at 649-50, 677-79,
        724-25; D.Ct. Tr. at 25-26.)

57.     In a letter dated December 19, 2003, the Pierces informed Mason that Amelia would
        receive home instruction for the short term and they requested an Interim IEP to that
        effect. (DP Tr. at 53; Mason DP Ex. 31 at 196.)

58.     In subsequent letters to the Mason School District in January 2004, Dr. Evans
        recommended home-instruction for Amelia until such time that she could transition back
        to attending school at Mason. Dr. Evans suggested that having a new team of teachers
        from Mason teach Amelia might help alleviate some of the anxiety towards the school
        placement that Amelia had been feeling. (Pierce–295, 296.)

59.     On December 31, 2003 the Pierces again met with Mason. The Pierces requested
        placement for Amelia in a LD classroom where she would be educated with a small
        group of other LD students. Mason offered to have Amelia spend more time in the
        resource classroom, but the Pierces objected because other students go in and out of the

resource classroom all day long. (DP Tr. at 55-56.)

60.    Mason offered at the December 31, 2003 to pay for Dr. Evans to meet with the IEP team to work on Amelia's transition back to public school. (DP Tr. at 54-57; Mason DP Ex. at 128.)

61.    On January 12, 2004, after meeting with Dr. Evans, Mason prepared a temporary IEP to have Amelia home schooled until she could transition back to the public school classroom. (Pierce–098-108.)

62.    On January 27, 2004, Mason offered again to place Amelia full-time in the special education or resource classroom, but the Pierces rejected the offer because it was not a self-contained classroom. (Mason DP Ex. 31 at 204-06.)

63.    In late January 2004, Amelia began home instruction with Mason providing her with five hours of academic instruction, one hour of occupational therapy, and one hour of speech per week at her home. Beginning in mid-February 2004, the Pierces supplemented Amelia's home instruction with her attendance four hours daily at the Langsford Learning Center where she was provided with an individualized multisensory program of reading and reading comprehension. (Pierce–098.)

64.    On April 19, 2004, Amelia began at the Trinity School after providing Mason with 10 days notice. The Trinity School is a kindergarten through eighth grade school with a total of thirty students. It uses a multisensory teaching approach and is geared toward students with different types of learning styles. Amelia attended the Trinity School through the 2005-2006 school year. (DP Tr. at 892-93, 899.)

65.    Mason prepared an IEP for Amelia for the 2004-2005 school year with the intent that Amelia transition back to the public school setting.. One placement option suggested in the IEP was for Amelia to receive pull-out instruction for all academic areas. (Mason DP Ex. 16; DP Tr. at 1214.)

66.    Mason contends that Amelia had made documentable progress during her time at Mason. It supports that contention with progress report worksheets prepared by Ms. Freudiger that compared Amelia's work from the assessments taken during the period of August 26, 2003 through September 23, 2003–the assessments were used as a baseline–to interim periods on October 21, 2003 and November 18, 2003. (DP Tr. at 155; Mason DP Ex. 26; D.Ct. Tr. at 207; D.Ct. Def. Ex. at 001.)

67.    Ms. Freudiger and other Mason teachers testified at the state due process hearing that Amelia made progress in the following areas while at Mason: her reading level accuracy and fluency increased; her writing and spelling skills improved; she was able to write in full sentences; her math skills improved in terms of counting and grouping items; she was able to tell time to the five minutes, instead of just to the o'clock and half-hour. (DP Tr.

at 157, 229, 368, 433.)

68.    The Pierces point to Amelia's test scores on standardized fourth grade reading proficiency tests that she took in October 2003 and March 2004 to support their position that Amelia did not make academic progress. Her test results did not show that Amelia made statistical progress on the fourth grade test. However, Ms. Freudiger discounted the relevance of the proficiency tests since all parties agree that Amelia was reading at a significantly lower grade level. (DP Tr. at 1229-30.)

69.    Dr. Lihshing Wang testified before this Court during its evidentiary hearing. She testified that Mason's curriculum-based measures did not accurately determine whether Amelia had made academic progress at Mason because there were structural problems with Mason's data and measurements. She identified five categories of problems. (1) Some worksheets did not correspond to or relate to the goal to which they were used to measure progress. Other worksheets were undated making it difficult to measure progress over time. (2) Some objectives and goals lacked baseline measurements to use to determine progress at a later date. (3) Mason had no underlying data worksheets to measure progress for some goals and objectives. (4) Mason did not use enough standardized or objective tests to measure progress. (5) Mason used different levels of tests and worksheets at different time making it difficult to measure Amelia's progress against a set standard.[1] (D.Ct. Tr. at 106-40.)

70.    Dr. Wang offered no opinion concerning the adequacy of the IEP, whether the goals and objectives were designed to encourage Amelia's educational progress. Her testimony was limited to the conclusion that the documentation Mason used to support its opinion that Amelia made progress was insufficient to establish that progress. (D.Ct. Tr. at 165.)

71.    Dr. Wang testified that both objective standardized testing and curriculum-based measures should be used to measure progress. She agreed that in this case there had not been sufficient time to collect enough data to make a reasonable determination of Amelia's progress. (D.Ct. Tr. at 166.)

72.    Dr. Evans also testified at the evidentiary hearing before this Court that Mason needed to use some forms of standardized testing to supplement any subjective curriculum-based testing to measure Amelia's progress. Use of curriculum-based measurements are susceptible to the problem that they might indicate that a student has made progress when measured against her own baseline result, but fail to demonstrate that she has fallen further behind her classmates in terms of their relative progress over the same period. He stated that standardized testing allows a student to be measured against her peer group.

---

[1] The Pierces and Dr. Wang listed six categories of problems, but two categories–"poor documentation of IEP data" and "misalignment of IEP objectives with measures"–were so interrelated that the Court has grouped them together.

(D.Ct. Tr. at 52-53, 74, 84-85.)

73.     Dr. Evans stated that any standardized tests Mason could have administered to Amelia, once to establish a baseline and a second time at a later date to measure progress, would be susceptible to a "test-retest" bias due to the short period of time that Amelia was at Mason. (D.Ct. Tr. at 73.)

74.     Dr. Evans admitted that he could not testify to whether Amelia had made progress while at Mason compared to the goals and objectives stated in the IEP. (D.Ct. Tr. at 90.)

## III.    PROCEDURAL HISTORY

After the Pierces withdrew Amelia from the Mason school and enrolled her in a private school, the parents moved the State for a due process hearing to determine if Mason had complied with the dictates of the IDEA and whether Mason had to pay for the cost of Amelia's placement in a private school. The Independent Hearing Officer ("IHO") issued his Decision on December 27, 2004 after the due process hearing was held. The IHO determined that the IEP proposed by Mason for Amelia was in compliance with the dictates of the IDEA and was designed to provide Amelia with a FAPE. He approved of Mason's use of a modified curriculum and found that Amelia made progress while at Mason. He also found that Mason had not ignored Amelia's emotional needs.

The Pierces appealed the IHO's Decision. On March 11, 2005, the SLRO Bruce A. Favret issued his Final Decision and Entry. SLRO Favret found that Mason had complied with its obligation to provide Amelia with FAPE. SLRO Favret was critical of the Pierces for not working collaboratively with Mason in regards to the formation of the IEP. SLRO Favret did not reach a final conclusion on the merits regarding the Pierces assertion that the IHO erred in ignoring Mason's purported failure to specify the use of multi-sensory instruction in core subjects. Instead, he noted that the Pierces had not raised this exact concern to Mason

throughout the IEP process or at the due process hearing.  However, he did note the numerous

ways that Mason incorporated multisensory educational services in the IEP: material and

directions read aloud, visual cues/models, multisensory reading program, highlight key words,

use of calculator, Touch Math and manipulatives, having a teacher trained in the Orton-

Gillingham method.

SLRO Favret upheld the IHO's conclusions that Mason did not fail to consider Amelia's

emotional needs.  He stated that the IHO did not need to accept the parents' version of events or

the experts' conclusions, when their conclusions did not reflect any consideration of factors

beside the school that might have affected Amelia's well-being, such as a history of frequent

moves and absences from school, among other factors.

SLRO Favret concluded that the IEP proposed by the District for the 2003-2004 and the

2004-2005 school years was designed to provide a meaningful educational benefit and did offer

Amelia a FAPE.

## IV.    ANALYSIS

The Pierces bring this action to overturn the decision of SLRO Favret.  Pursuant to the

IDEA, once an aggrieved party has exhausted administrative remedies, he may bring suit in the

federal district court pursuant to 20 U.S.C. § 1415(i)(2)(A).  In these actions, the district court

> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such
> relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(B).  In states such as Ohio with a two-tiered administrative process, it is

the decision of the second tier that the Court reviews.  Thomas v. Cincinnati Bd. of Educ., 918

F.2d 618, 624 (6th Cir. 1990).  The burden of proof or persuasion in this case is on the party

seeking relief, here the Pierces who look to overturn the SLRO's decision.  Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. 528, 535 (2005).

The standard of review for IDEA cases is "distinctive" and "elusive."  Zelazny, 325 F.3d at 728.  "When reviewing cases brought under the Act, courts must determine [1] whether the state has complied with the Act's procedural requirements, and [2] whether the IEP is reasonably calculated to enable the child to receive educational benefits."  Thomas, 918 F.2d at 624 (citing Rowley, 458 U.S. at 206).  Courts employ a "modified de novo review" wherein the courts perform a "de novo review of the due process hearing," but give the "findings of the state administrative proceedings . . . due weight."  Zelazny, 325 F.3d at 728.  Courts must be cognizant that "we may not substitute our notion of sound educational policy for that of  the school authorities."  Id.  The Sixth Circuit has explained further as follows:

> The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. More weight is due to an agency's determinations on matters for which educational expertise is relevant.

McLaughlin v. Holt Public Schools Bd. of Educ., 320 F.3d 663, 669 (6th Cir. 2003).  Giving due weight to the findings of educational experts is a practice borne from common sense.  "Federal courts are generalists with no expertise in the educational needs of [disabled] children, and will benefit from the factfinding of a state agency with expertise in the field."  Deal., 392 F.3d at 865 (citation omitted).

## A.     Alleged Procedural Violation of the IDEA

The Pierces argue that Mason violated a procedural requirement to use objective criteria and evaluation procedures in the IEP and thus denied Amelia a "free appropriate public

16

education." Preliminarily, Mason contends that the Pierces cannot assert this argument for the first time to this Court because it was not raised at the state level. The Pierces state in response that they did not have the information underlying this response until these proceedings because Mason had not previously supplied the underlying data Ms. Freudiger used to compile her reports of Amelia's progress.

The Court allowed the Pierces to introduce the new evidence of the underlying data (including worksheets completed by Amelia and similar material) at a hearing held in September 2006. The district court's authority to hear additional evidence under § 1415(i) is broad, but that additional evidence generally may be used only to rule upon those issues first presented in the state administrative proceedings. Metropolitan Bd. of Educ. of Nashville v. Guest, 193 F.3d 457, 463 (6th Cir. 1999). A district court should not permit the new evidence to change the character of the hearing from one of review to a trial *de novo*. Metropolitan Bd. of Educ. of Nashville v. Bellamy, 116 Fed. Appx. 570, 576 (6th Cir. 2004). For example, in Guest, the Sixth Circuit held that the district court had erred to the extent it used additional evidence to adjudicate issues not before the administrative law judge when he issued his opinion, including whether later-proposed IEPs were valid and whether the disabled child could be sent to a private residential facility. 193 F.3d at 463. The Sixth Circuit stated that the parents "should have been required to seek an impartial due process hearing [on those issues] before bringing those issues before the district court." Id.

In a different set of circumstances, the Sixth Circuit stated that the district court properly made a finding of a procedural violation, even though the administrative judge had not made such a finding, because the district court's finding was based on evidence that had been

presented to the administrative judge.  Bellamy, 116 Fed. Appx. at 577-78.  The Bellamy court also stated that when analyzing whether to permit new evidence, the district court should "weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources."  Id. at 576 (citation omitted).

The Court here need not determine whether this case is more like Bellamy where the issue was properly heard, or Guest, where the issue was not properly heard, because the Court finds against the Pierces on the merits of their argument in any event.

Turning to the substance of the argument, the Pierces cite to 20 U.S.C. § 1401(a)(20)(F) for the requirement that an IEP must include "appropriate objective criteria and evaluation procedures and schedules for determining on at least an annual basis whether instructional objectives are being achieved."  To begin, the statutory  provision cited by the Pierces appears in the statute as it existed before the October 7, 1998 effective date of amendments to the IDEA contained in Pub. L. 105-244.[2]  In the version of the IDEA applicable to Amelia's IEP, the definition of an "individualized education program" contained in § 1401 states that an IEP should be developed in accordance with 20 U.S.C. § 1414(d).  See 20 U.S.C. § 1401(11). Section 1414(d) does not explicitly require the use of "objective criteria and evaluation procedures and schedules."  Instead, § 1414(d) requires the IDEA to include:

a statement of *measurable annual goals*, including benchmarks or short-term

---

[2] The IDEA as stated in Pub. L. 105-244 was effective through June 5, 2005 when the IDEA was comprehensively re-amended in Pub. L. 108-446.  All cites herein, except as noted, are to the IDEA as it was enacted in Pub. L 105-244.

objectives, related to –
(I) meeting the child's needs that result from the child's disability to enable the
child to be involved in and progress in the general curriculum; and
(II) meeting each of the child's other educational needs that result from the
child's disability.

20 U.S.C. § 1414(d)(1)(A)(ii) (emphasis added); see also Zelazny, 325 F.3d at 729 (quoting the

technical requirements of an IEP, including the statement of measurable annual goals).  The

Code of Federal Regulations in 2003 still did require the use of "[a]ppropriate objective criteria

and evaluation procedures and schedules for determining . . . whether instructional objectives are

being achieved."  34 U.S.C. § 222.50; 34 C.F.R. § 222.50 (2004).

In Cleveland Heights-University Heights City Sch. Dist. v. Boss, 144 F.3d 391 (6th Cir.

1998), a case heard under the former IDEA scheme that explicitly required the use of "objective

criteria," the disabled child's parents objected to a proposed IEP in part because it did not

provide an objective way to measure the child's progress.  144 F.3d at 394.  The court criticized

as being "vague and general" statements on the IEP that the student's "progress would be

measured in terms of her ability to do things such as 'identify' a 'list of sight words ... with 80%

accuracy' and 'improve her reading fluency when reading a passage aloud 8/10 times.'"  Id. at

394 n.1.  Importantly, the IEP also failed the requirement to specify the services to be provided

to the student during the 50% of the day she was mainstreamed.  Id. at 394.  The Sixth Circuit

found that the failure to provide objective criteria was "far from technical," that "its absence was

not harmless, and that "the omission went to the heart of the substance of the plan."  144 F.3d at

399.

Not all failures to include objective criteria in the IEP result in a substantive violation.  In

a later opinion written after the amendment of the IDEA to include only a requirement for

19

"measurable annual goals," the parents challenged the proposed IEP for a failure to provide a baseline to measure future progress.  See Nack v. Orange Cty. Sch. Dist., 454 F.3d 604, 612 (6th Cir. 2006).  The Sixth Circuit held that the technical failure did not result in a substantive violation because objective test results demonstrated the student's progress and demonstrated that the student had not been harmed thereby.  Id.

This case is distinguishable from Nack because there is a good faith dispute about whether Amelia made progress at Mason, but the case is also distinguishable from Boss.  Mason used the results of standardized tests Amelia took in mid-2003 to help formulate the goals and benchmarks stated in the IEP.  The Pierces do not appear to object so much to the goals and benchmarks themselves as to the standards Mason used to measure progress under the goals. Their experts likewise only oppose the measures used.

The IEP goals and benchmarks are more specific than the limited examples of goals identified in Boss.  For example, instead of simply referring to sight word lists, Amelia's IEP specifies in Goal 1(b) that she should be able to identify Dolch sight word lists 1-6 that correspond up to a second grade reading level with 90% accuracy.  Amelia's IEP then identifies multiple services Mason will provide to help her reach the reading goal cited including the presence of an instructional aide, the use of a multi-sensory teaching approach, and the use of visual cues.  This is a stark contrast from the Boss IEP that did not provide the same specificity in the stated goal and did not identify the services that would be employed to help the student reach the goal.  The Court finds that Amelia's IEP does state a "measurable annual goal" for purposes of 20 U.S.C. § 1414(d)(ii) in regards to the Dolch sight words goal.

For another example, in Goal 7(a), the benchmark set is for Amelia to be able to answer

20

factual questions related to a 2-4 sentence paragraph orally presented with 80% accuracy. It calls for services including weekly speech therapy, the use of individual or small group instruction, the use of visual cues, and the help of the teacher aide to facilitate Amelia reaching the goal. This goal may not be correlated to a standardized test, but it appears to be a measurable goal for purposes of § 1414(d)(1)(A)(ii). Cf. Logue v. Unified Sch. Dist. No. 512, Shawnee Mission, Nos. 97-3087, 97-3112, 1998 WL 406787, *4 (10th Cir. 1998) (finding the following goal to meet the objective criteria standard: "Noah will produce verbs and prepositions at the sentence level in response to pictures with no clinician prompts with 90% accuracy over 2 consecutive sessions"). To find otherwise would be to substitute the Court's notion of sound educational policy for that of the school administrators, something the Court is loathe to do. See Zelazny, 325 F.3d at 728. In sum, the Court finds that as a whole the IEP does satisfy the "measurable annual goals" requirement of the IDEA.

The Court is not persuaded to hold otherwise because Dr. Evans and Dr. Wang criticized the curriculum-based measurements that Mason used. Dr. Evans stated that Mason could not determine whether Amelia's performance had improved or suffered vis-a-vis her peer group's performance using its curriculum-based methodology. Dr. Evan's critique might be factually correct, but IDEA does not require that an IEP be designed to improve a student's academic performance vis-a-vis her age-group peers. Rather, the IEP must be designed to confer a meaningful educational benefit upon a disabled child "gauged in relation to the potential of the child at issue." Deal, 392 F.3d at 862. Moreover, Dr. Evans acknowledged that Amelia did not attend Mason schools for a sufficient length of time to have enabled Mason to accurately assess Amelia's progress with standardized testing (i.e. without a test/re-test bias). And Dr. Evans

21

admitted that he did not know whether Amelia had made progress toward the IEP goals while at Mason.

Finally, Dr. Wang's detailed criticisms of the underlying curriculum data that Mason used to help evaluate Amelia's progress does not change the Court's holding. Like Dr. Evans, Dr. Wang favored the use of standardized tests to measure Amelia's progress, but she also acknowledged that Amelia did not attend Mason schools long enough for her progress to have been measured with standardized tests. Dr. Wang was able to point out specific instances where curriculum data Mason used did not support a claimed measure of progress for a specific goal or benchmark on the IEP. However, the flaws pointed out by Dr. Wang are not in the Court's opinion so widespread and serious as to completely undermine the validity of the measurable goals and benchmarks stated on Amelia's IEP. For example, Dr. Wang pointed out isolated benchmarks on the IEP where Mason failed to provide a baseline, but the fact remains that a large majority of the goals and benchmarks listed on the IEP were measured against established baselines. Also, Dr. Wang's testimony does not impeach in the Court's mind the compelling and consistent testimony of Amelia's teachers at Mason who met weekly to review Amelia's progress under the IEP and who had concluded that Amelia had made academic progress. Finally, Dr. Wang conceded that she offered no opinion as to the adequacy of the goals and objectives themselves stated on the IEP.

In sum, the Court finds that the Pierces have not met their burden to establish that Mason violated the IDEA's procedural requirement to use "objective criteria and procedures."

**B.     Alleged Substantive Violations of the IDEA**

**1.     Alleged Inappropriate Placement**

Next, the Pierces contend that SLRO Favret erred in finding that Mason's placement of Amelia in general education for core academic subjects was appropriate.  Preliminarily, a few general observations are in order.  Generally, when the parents or guardians challenge the methodology by which the disabled student is educated, "the Supreme Court has emphatically stated that such questions should be left to the states."  Roncker v. Walter, 700 F.2d 1058, 1062 (6th Cir. 1983).  Moreover, because the procedural requirements of the IDEA have been satisfied, "greater deference is to be afforded to the district's placement decision."  Dong, 197 F.3d at 800.  Id.  Due weight is also to be given to the SLRO's findings because placement and methodology are matters where educational expertise is relevant.

The Pierces contend that the SLRO made errors in his factual findings and that his decision is entitled to less weight.  The Pierces state that the SLRO relied too much on his factual finding that Amelia had an instructional aide or the special education teacher with her at all times in the general education classroom.  This Court agrees with the Pierces to the extent that the testimony at the state level due process hearing demonstrated that the instructional aide who was hired by Mason in anticipation of Amelia's significant needs did help other students at times.  However, the language arts teacher testified that an aide was always with Amelia during language arts and was with Amelia for social studies during a majority of the time. Ms. Freudiger's testimony was that the instructional aide only assisted other students if she herself were helping Amelia.  The Court finds that the presence of an instructional aide was a significant factor in Amelia's education at Mason.

The Pierces also assert that the SLRO erred in concluding that Amelia made progress at Mason schools.  However, the Court finds that the evidence does not establish by a preponderance that Amelia failed to make progress.  Despite the Pierce's criticism of the underlying curriculum data, there is documentary evidence and testimony by the Mason teachers that they witnessed Amelia make academic progress.  Again, the short length of time that Amelia attended Mason is relevant to this inquiry.  The Pierces favored standardized testing, but their own experts stated that any standardized testing completed during the time Amelia attended Mason would have been subject to a test-retest bias.  The standardized reading test that the Pierces point to showing that Amelia did not make statistically significant progress has little probative value because it apparently tested Amelia at a fourth grade reading level, a level the parties agree was well above her capabilities.  The letter writing "backtracking" that the Pierces state occurred between October 2003 and March 2004 cannot be blamed definitely on the IEP because the Pierces pulled Amelia out of Mason in December 2003.  Moreover, the lack of demonstrable progress would not be fatal to a finding that the IEP was designed to provide FAPE.  See Nack, 454 F.3d at 614 (rejecting an argument that a student's lack of progress demonstrated IEP's fallability).  "[T]he IDEA does not guarantee success."  Id.

The Court finds that the Pierces have not established that Amelia's IEP was not reasonably calculated to provide her with a FAPE.  Mason followed the procedural mandates of the IDEA in formulating the IEP.  The IEP took into account Amelia's unique learning disabilities and individualized needs.  It contained specific goals and benchmarks designed to facilitate her learning despite her disability.  Again, though the Pierces criticize the proposed placement for Amelia (i.e., placement in the general education classroom and the resource

24

classroom) and the means by which Amelia's progress was to be measured, the Pierces raise little if any objection to the specific goals and benchmarks identified in the IEP.

Mason favored mainstreaming Amelia to the extent possible consistent with the IDEA requirement to educate a disabled child in the "least restrictive environment" possible. 20 U.S.C. 1412(a)(5). The IEP for Amelia sought to compensate for Amelia's auditory processing deficit and dyslexia and other disabilities by providing her with small group and on-on-one instruction, the assistance of an instructional aide, and the use of multi-sensory teaching methods in the general education classroom. It called for reinforcing Amelia's instruction in several core subjects in a resource room with fewer students. It provided her with a routine and structure in her daily schedule. Amelia was taught math and reading in the Orton-Gillingham method.

Moreover, Mason was receptive to many of the Pierces' concerns and made modifications to the proposed IEP including an increase in the amount of speech therapy and decrease in the amount of homework Amelia received. The Pierces, on the other hand, never stated their objections to the 2003-2004 IEP in writing as they had proposed to do and withdrew Amelia from Mason less than three months after the IEP was formally proposed. As early as December 2003 or January 2004, and again when discussing the 2004-2005 IEP, Mason proposed as a possible placement teaching Amelia in the resource room for all core academic subjects without mainstreaming. The Pierces disdained the resource classroom used by Mason as not being an appropriate substitute for the self-contained classroom employed by Antioch. The Court recognizes the differences between Mason's resource classroom and the self-contained classroom preferred by the Pierces. Nonetheless, placement in the resource room for the majority of the day would have provided consistent structure for Amelia and each individual

25

class period would contain a smaller number of students in a quieter environment. Thus, placement in the resource room is consistent with the recommendation of the experts who evaluated Amelia in June 2003 and the recommendation of Dr. Evans that Amelia be educated in small, structured classrooms. The Pierces have not met their burden of establishing that the IEP was not calculated to provide Amelia with an educational benefit.

### 2.    Alleged Failure to Account for Amelia's Well-Being

The Pierces argue that the SLRO erred because he failed to consider Amelia's emotional well-being when he found that her placement in general education was appropriate. This issue presented the Court with difficult and troubling questions. How does the Court reconcile the apparent divergence between the positive attitude and outward signs of emotional well-being that Amelia displayed at school with the anxiety and depression that Amelia displayed at home? How does the Court determine on the record before it whether Amelia's apparent anxiety and depression was caused by Amelia's school placement or by other factors in her life? Assuming that Amelia's placement in a general education was, as Dr. Evans found, a focal stressor for Amelia, did Mason respond appropriately by offering her counseling and offering to place Amelia in the resource classroom for all her classes? While the Court does not question the Pierces' decision to withdraw Amelia from Mason public schools in terms of whether it was an appropriate parental decision made out of sincere concern for Amelia's emotional well-being, the Court still must determine whether the Pierces are entitled to reimbursement for the placement of Amelia in private school.

The IDEA and case law interpreting it are of limited value in answering these questions. The primary case cited by the Pierces is easily distinguishable on the facts. The disabled student

26

in Gerstmyer v. Howard Cty. Pub. Schs., 850 F.Supp. 361 (D. Md. 1994), like Amelia, displayed signs of hostility and depression at home that he did not express at school. Id. at 363. However, the Gerstmyer court did not need to consider how to reconcile a child's apparent lack of emotional well-being with an IEP that otherwise appears to provide a FAPE. The school district utterly failed to meeting procedural or substantive requirements of the IDEA in Gerstmyer. The school district failed to preplan for the disabled child's arrival in the school district; the school district had refused to test the child during the summer and then refused in the fall to rely on the testing paid for by the parents; the school district delayed in scheduling the student's IEP meeting and then postponed the meeting that was scheduled; and finally, the IEP the school district ultimately proposed was not specifically designed for the child's needs, but was rather a mish-mash of IEPs the school district had used for other students. Id. at 363-66. The court concluded that the student's "critical first grade year began without an IEP being in place or ready to be in place and, as a result, he was denied [a] free appropriate public education." Id. at 366. Here, Mason attempted, from the time it learned that Amelia was coming to Mason, to develop an education plan utilizing special services to meet Amelia's specific educational needs. Gerstmyer simply does not aid the Court's analysis.

Mason does not refute with evidence in the record the expert testimony of Dr. Evans that Amelia's school placement was a focal stressor for Amelia.[3] Nonetheless, it does not follow that Mason's IEP did not provide a FAPE and Mason is obligated to pay for Amelia's private school placement. To begin, the Court agrees with SLRO Favret to the extent that he concluded that

---

[3] Other stressors in Amelia's life included her family's recent move to Cincinnati and her loss of contact with her best friend.

Mason did not ignore Amelia's emotional needs. Mason could not reasonably have been expected to anticipate in the fall of 2003 when it developed Amelia's IEP that Amelia would demonstrate extreme anxiety related to her schooling. It is true that the Pierces objected to Amelia's mainstreaming from the outset because of Amelia's academic struggles in regular social studies at Antioch. However, Mason intended to offer Amelia greater individualized instruction in the general education classroom, including the help of a teacher aide, than Antioch had provided.

When the Pierces notified Mason about Amelia's developing problems, Mason repeatedly sought to provide counseling for Amelia with the school psychologist. The Pierces refused the offer preferring instead to rely on Dr. Evans. Mason offered to pay for Dr. Evans to observe Amelia in the classroom. After Dr. Evans recommended withdrawing Amelia from Mason temporarily, he then made recommendations to Mason and the Pierces for how Amelia could transition back to the Mason classroom. Mason sought to facilitate Amelia's return to the public school environment by suggesting that Amelia be educated full-time in the special education or resource classroom. It paid Dr. Evans to meet with Amelia's IEP team to facilitate her return. Dr. Evans agreed that Mason's resource classroom could be structured to provide the same types of benefits to Amelia that the self-contained classroom he favored for Amelia would provide. Thus, the evidence as a whole does not establish conclusively that Mason's proposed IEP for Amelia, including the modifications suggested by Mason in light of Amelia's emotional difficulties, was not reasonably calculated to provide Amelia educational benefit.

C.      **Reimbursement for Trinity School**

In this case, the Pierces seek reimbursement for their placement of Amelia at the Trinity

School.  "Removal of the disabled child to a private school at public expense is only

contemplated under the Act when the public school is unable to provide the child with an

appropriate education and the private school is able to do so."  <u>Gillette By and Through Gillette</u>

<u>v. Fairland Bd. of Educ.</u>,  932 F.2d 551, 554 (6th Cir. 1991).   The Court has determined here

that the Pierces have failed to establish that Mason was unable to provide Amelia with an

appropriate education under the IDEA.  Thus, the Pierces are not entitled to reimbursement for

Amelia's private school education.

**V.      CONCLUSION**

       The Final Decision and Entry of the State Level Review Officer is **AFFIRMED**.

       IT IS SO ORDERED.


                                                      _____s/Susan J. Dlott_____
                                                      Susan J. Dlott
                                                      United States District Judge